UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

*FILED
...RKS OFFICE*

*...3 -7 P 2:53*

LOUIS G. RASETTA and JOHN J. SHAUGHNESSY,
as they are TRUSTEES, INTERNATIONAL UNION
OF OPERATING ENGINEERS LOCAL 4 HEALTH
AND WELFARE, PENSION AND ANNUITY FUNDS,
and LOUIS G. RASETTA and CHRISTOPHER
BARLETTA, as they are TRUSTEES, HOISTING AND
PORTABLE ENGINEERS LOCAL 4 APPRENTICE
AND TRAINING FUNDS and INTERNATIONAL
UNION OF OPERATING ENGINEERS, LOCAL 4,
                    Plaintiffs

*05 10425 RCL*

MAGISTRATE JUDGE 1A

vs.

C.A. No.

SAI SURVEYING CORPORATION and
BARBARA SZEPATOWSKI,
                    Defendants

RECEIPT # _____
AMOUNT $ _____
SUMMONS ISSUED _____
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE _____

and

CITIZENS BANK,
                    Trustee

## COMPLAINT

## NATURE OF ACTION

1.      This is an action brought pursuant to §§502 and 515 of the Employee Retirement

Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§1132(a)(3) and (d)(1) and

1145 and §301 of the Labor Management Relations Act, 29 U.S.C. §185 by employee benefit

plans and a labor union to enforce the obligations to make contributions and pay interest due to

such plans due under the terms of a collective bargaining agreement and the plans.

## JURISDICTION

2.      The Court has exclusive jurisdiction of this action pursuant to §502(a), (e) and (f) of ERISA, 29 U.S.C. §§1132(a), (e) and (f), without respect to the amount in controversy or the citizenship of the parties.

## PARTIES

3.      Plaintiffs Louis G. Rasetta and John J. Shaughnessy are Trustees of the International Union of Operating Engineers Local 4 Health and Welfare Fund. The International Union of Operating Engineers Local 4 Health and Welfare Fund is an "employee welfare benefit plan" within the meaning of §3(3) of ERISA, 29 U.S.C. §1002(3). The Fund is administered at 177 Bedford Street, Lexington, Massachusetts, within this judicial district.

4.      Plaintiffs Louis G. Rasetta and John J. Shaughnessy are Trustees of the International Union of Operating Engineers Local 4 Pension Fund. The International Union of Operating Engineers Local 4 Pension Fund is an "employee pension benefit plan" within the meaning of §3(2) of ERISA, 29 U.S.C. §1002(2)(A). The Fund is administered at 177 Bedford Street, Lexington, Massachusetts, within this judicial district.

5.      Plaintiffs Louis G. Rasetta and John J. Shaughnessy are Trustees of the International Union of Operating Engineers Local 4 Annuity Fund. The International Union of Operating Engineers Local 4 Annuity Fund is an "employee pension benefit plan" within the meaning of §3(2)(A) of ERISA, 29 U.S.C. §1002(2)(A). The Fund is administered at 177 Bedford Street, Lexington, Massachusetts, within this judicial district.

6.      Plaintiffs Louis G. Rasetta and Christopher Barletta are Trustees of the Hoisting and Portable Engineers Local 4 Apprenticeship and Training Fund. The Hoisting and Portable Engineers Local 4 Apprenticeship and Training Fund is an "employee welfare benefit plan"

2

within the meaning of §3(1) of ERISA, 29 U.S.C. §1002(1). The Fund is administered at One Engineers Way, Canton, Massachusetts, within this judicial district.

7.    The Health and Welfare, Pension, Annuity, Apprenticeship and Training Funds are multi-employer plans within the meaning of §3(37) of ERISA, 29 U.S.C. §1002(37). They are hereinafter collectively referred to as "the Funds."

8.    The International Union of Operating Engineers Local 4 (hereinafter "Union") is a labor organization within the meaning of §301 of the LMRA, 29 U.S. C. §185. The Union is administered at 53 Trotter Drive, Medway, Massachusetts, within this judicial district.

9.    Defendant SAI Surveying Corporation (hereinafter "SAI" or "the Employer") is a Massachusetts corporation with a principal place of business listed at 663 East Broadway, South Boston, Massachusetts, and is an employer engaged in commerce within the meaning of §3(5) and (12) of ERISA, 29 U.S.C. §1002(5) and (12). It is currently doing business at 23 Narragansett Avenue, Jamestown, Rhode Island.

10.    Defendant Barbara Szepatowski (hereinafter "Szepatowski") is an individual residing at 7 Green Lane, Jamestown, Rhode Island. Upon information and belief, Szepatowski is the president and owner of SAI and exercises control and discretion over the payroll of SAI including any and all decisions regarding the collection and disbursement of any payroll deductions authorized by the employees of SAI. As such, Szepatowski is a fiduciary to the International Union of Operating Engineers Local 4 Annuity and Annuity & Savings 401(k) Fund as defined by § 3(21) of ERISA, 29 U.S.C. §1002(21).

11.    Citizens Bank, on information and belief, is holding assets of the defendant.

## GENERAL ALLEGATIONS OF FACT

12.     Defendant SAI is signatory to a collective bargaining agreement with International Union of Operating Engineers Local 4E, called the Field Engineers - Technical Engineers Agreement, a copy of which is attached hereto as Exhibit A.

13.     The Agreement binds SAI to the Funds' Trust Agreements and obligates SAI to make contributions to Plaintiff Funds for each payroll hour for each person covered by the Agreement, in accordance with the rates set forth on the Schedules of Wages.

14.     Specifically, the Agreement, in part, obligates SAI, upon written authorization by its employees, to withhold an amount from the employee's gross wage, before taxes, for deposit in the Annuity & Savings 401(k) Fund.

15.     Pursuant to the Agreement, SAI is also obligated to deduct and remit a negotiated percentage of the gross wage package, before taxes, for union dues.

## COUNT I - VIOLATION OF ERISA -
## DELINQUENT CONTRIBUTIONS

16.     Plaintiffs incorporate by reference each and every allegation set forth in paragraphs 1-15 supra.

17.     The Funds filed a lawsuit in this Court (C.A. No. 03-12383) in November 2003 against SAI under ERISA for failing to pay contributions.  This Court entered a Default Judgment against SAI on August 19, 2004 in the amount of $48,617.94 for contributions owed for the months of June through November, 2002 and September through December, 2003.  This judgment has not been satisfied to date.

4

18.    Since filing the lawsuit on which it received a Default Judgment against SAI, the Funds have deduced through a review of employee pay stubs that SAI has amassed an additional delinquency of $66,582.82 in contributions owed for the period May through December, 2004.

19.    SAI remitted a partial payment of $26,114.00 to the Funds on December 31, 2004, leaving a balance due of $40,468.82. However, SAI did not submit the requisite remittance reports demonstrating the individuals and hours for which the payment was made.

20.    In fact, SAI has failed and refused to submit any remittance reports for the relevant months of May through December, 2004.

21.    SAI continues to owe the Funds $40,468.82 in contributions for the period May through December, 2004, and may be liable for additional obligations incurred thereafter.

22.    The failure of SAI to make contributions on behalf of all covered employees as required by the terms of the Funds and the collective bargaining agreement violates §515 of ERISA, 29 U.S.C. §1145.

23.    Absent an order from this Court, the defendant will continue to refuse to pay the monies it owes to the Funds, and the Funds and their participants will be irreparably damaged.

24.    A copy of this Complaint is being served upon the Secretary of Labor and the Secretary of the Treasury by certified mail as required by §502(h) of ERISA, 29 U.S.C. §1132(h).

WHEREFORE, in Count I Plaintiff Funds request this Court to grant the following relief:

a.    Order the attachment of the machinery, inventory and accounts receivable of defendant SAI;

b.    Enter a preliminary and permanent injunction enjoining SAI from refusing or failing to make contributions and pay interest to Plaintiff Funds;

c.     Enter judgment in favor of the Plaintiff Funds in the amount of $40,468.82 plus any additional amounts determined by the Court to be owed by SAI or which may become due during the pendency of this action, together with interest on the unpaid contributions, liquidated damages, reasonable attorneys' fees, and costs, all pursuant to 29 U.S.C. §1132(g)(2); and

d.     Such further and other relief as this Court deem appropriate.

## COUNT II - VIOLATION OF LMRA - DELINQUENT CONTRIBUTIONS, DUES AND INTEREST

25.    Plaintiffs incorporate by reference each and every allegation set forth in paragraphs 1-24 supra.

26.    Between May and December, 2004, SAI deducted dues from its employees' paychecks, which it failed to remit to the Union.  The failure of SAI to make contributions on behalf of all covered employees, to remit the dues it deducted from its employees' paychecks and to pay interest as required by the terms of the collective bargaining agreement violates §301 of the Labor Management Relations Act, 29 U.S.C. §185.

WHEREFORE, in Count II Plaintiff Funds request this Court to grant the following relief:

a.     Order the attachment of the machinery, inventory and accounts receivable of defendant SAI;

b.     Enter a preliminary and permanent injunction enjoining SAI from refusing or failing to make contributions and pay interest to Plaintiff Funds;

c.     Enter judgment in favor of the Plaintiff Funds in the amount of $40,468.82 plus additional amounts determined by the Court to be owed by SAI or which may become due during the pendency of this action; and

6

d.      Such further and other relief as this Court deem appropriate.

## COUNT III – BREACH OF FIDUCIARY DUTY BY
## DEFENDANT BARBARA SZEPATOWSKI

27.      Plaintiffs incorporate by reference each and every allegation set forth in paragraphs 1-26 supra.

28.      When employees of SAI elected to defer a portion of their pre-tax wages into the Annuity & Savings 401(k) Fund, pursuant to Article XII, Section 2(a) of the Agreement, those deferred wages became plan assets within the meaning of 29 CFR 2510.3-102.

29.      By exercising discretion and control over these plan assets, Defendant Szepatowski is a fiduciary within the meaning of §3(21) of ERISA, 29 U.S.C. §1002(21).

30.      Szepatowski is obliged to discharge her duties as a fiduciary to the Annuity & Savings 401(k) Fund solely in the interests of the participants and beneficiaries of the Fund.

31.      By retaining plan assets, and upon information and belief, converting those plan assets to the use of herself and/or SAI or others, Szepatowski has breached her fiduciary duty to the Plaintiff Annuity & Savings 401(k) Fund in violation of Sections 404 and 409 of ERISA, 29 U.S.C. §§1104, 1109.

WHEREFORE, in Count III Plaintiff Funds request this Court to grant the following relief:

a.      Enter judgment in favor of the Plaintiff Funds in the amount of $2,214.00 for all deferred amounts deducted from the wages of the employees of SAI which were authorized as elective deferrals into the 401(k) Plan for the months of July through December, 2004, and all deferrals which became due thereafter, along with interest, liquidated damages, reasonable attorneys' fees, and costs, all pursuant to 29 U.S.C. §1132(g)(2);

b.    Enter judgment in favor of the Plaintiff Funds for all losses to the Annuity &

Savings 401(k) Fund resulting from Szepatowski's breach of fiduciary duty, as provided by 29

U.S.C. §1109(a); and

c.    Such further and other relief as this Court deem appropriate.

## COUNT IV - RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ("RICO") CLAIM AGAINST BARBARA SZEPATOWSKI AND SAI SURVEYING CORPORATION

32.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1

through 31 above.

33.    SAI's corporate headquarters are located in South Boston, Massachusetts.

34.    However, upon information and belief, defendant Szepatowski operates in the

usual course of business out of an office in Jamestown, Rhode Island. The collective bargaining

agreement SAI signed with the Funds lists the Jamestown, Rhode Island address as its place of

business.

35.    Upon information and belief, the company's Massachusetts-based projects during

the months of May through December, 2004 were coordinated, in part, from the South Boston

corporate office or from the various Massachusetts-based job sites themselves.

36.    SAI requested operators from the International Union of Operating Engineers

Local 4 to work on a number of projects within the Commonwealth during the period May

through December, 2004. Operators were then provided to SAI under the terms of the collective

bargaining agreement. SAI was obligated to make contributions to Plaintiff Funds for each hour

worked by the covered employees.

37.     The Funds never received the contributions owed from SAI for hours worked by its members.  Additionally, the Funds did not receive remittance reports for hours worked between May and December, 2004.

38.     Upon information and belief, Rhode Island-based Szepatowski and Massachusetts-based agents of SAI would have used the telephone, electronic mail, and other such interstate wire communications to ascertain the hours worked by operators on the Massachusetts jobs, to arrive at the intent to not pay contributions owed for such hours, and thereby, to defraud the Funds of thousands of dollars of assets.  This alleged scheme injured the Funds' members by denying them their hard-earned and contractually-obligated benefits.

39.     By engaging in this alleged conduct, Szepatowski and SAI caused sounds and/or signals to be transmitted by means of wire in interstate commerce for the purpose of executing a scheme to defraud the Funds.  This alleged conduct is an act of wire fraud that is indictable under 18 U.S.C. §1343.

40.     Further, by failing to provide contractually-mandated fringe benefit contributions for the period May through December, 2004, Szepatowski and SAI have stolen, or unlawfully and willfully abstracted or converted to their own use, money, funds, credits, and property of the Fund.  This offense is indictable under 18 U.S.C. §664.

41.     SAI is an "enterprise" within the meaning of 18 U.S.C. §1961(4).

42.     By its conduct alleged in the preceding paragraphs, Szepatowski and SAI have directly and indirectly conducted SAI's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §1962(c).

43.     As a direct result of the violation of 18 U.S.C. §1962(c) by Szepatowski and SAI, the Funds have been injured through December, 2004 in the amount of $40,468.82 and in an unliquidated amount for the period thereafter.

WHEREFORE, Plaintiffs request this Court to grant the following relief on Count IV:

a.      Enter judgment in favor of the Plaintiff Funds in the amount of $121,406.46, representing mandatory treble damages under 18 U.S.C. 1964(c) of the $40,468.82 injury caused by the Defendants for the period May through December, 2004, and in an additional amount representing treble damages from January, 2005 until judgment in an amount to be determined by the Court, or such other sum as may be due at judgment as determined by the Court, plus interest, costs, and attorneys' fees; and

b.      Such further and other relief as this Court deems appropriate.

## COUNT V - VIOLATION OF M.G.L. c. 154 §8

44.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 43 above.

45.     Pursuant to the Agreement, SAI is obligated to deduct and remit a negotiated percentage of the gross wage package, before taxes, for union dues.

46.     However, between May and December, 2004, SAI deducted dues from its employees' paychecks and failed to remit these amounts to the Union.

47.     The failure of SAI to remit to the Union these amounts deducted from the salaries of its employees is a violation of M.G.L. c. 154 §8.

WHEREFORE, Plaintiffs request this Court to grant the following relief on Count V:

a.      Enter judgment in favor of the Plaintiff Union in the amount of $2,201.54, representing dues that SAI failed to remit for the period July through December, 2004, plus

additional amounts in dues determined by the Court to be owed by SAI or which may become due during the pendency of this action;

b.    Enter judgment in favor of the Plaintiff Union, pursuant to M.G.L. c. 154 § 8, in the amount of $100.00 for each employee from whose paycheck SAI deducted dues but failed to remit said dues to the Union, for a total of $400.00; and

c.    Such further and other relief as this Court deem appropriate.

Respectfully submitted,

LOUIS G. RASETTA and JOHN J. SHAUGHNESSY, as they are TRUSTEES, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 4 HEALTH AND WELFARE FUND, et al,

By their attorneys,

Anne R. Sills, Esquire
BBO #546576
Gregory A. Geiman, Esquire
BBO #655207
Segal, Roitman & Coleman
11 Beacon Street
Suite #500
Boston, MA 02108
(617) 742-0208

Dated:  March 3, 2005

GAG/gag&ts
ARS 3118 03-255/complt2.doc

11

# FIELD ENGINEERS - TECHNICAL ENGINEERS

## AGREEMENT

### between

## ASSOCIATIONS - INDEPENDENT EMPLOYERS

### and

## INTERNATIONAL UNION of OPERATING ENGINEERS

## LOCAL 4 E



November 1, 1999 - October 31, 2003

120 Mount Hope Street, Roslindale, MA 02131
Phone (617) 323-9300 - Fax (617) 323- 7821 - e-mail IUOELocal4@erols.com

*Property of Local 4*

This Agreement entered into this first day of November 1999, by and between the Associations and such Independent Employers as subscribed below, hereinafter known as the "Employer," and the International Union of Operating Engineers Local No. 4-E, hereinafter known as the "Local" or and shall continue in full force and effect through the 31st day of October 2003.

## PREAMBLE

This Agreement is entered into to facilitate the adjustment of grievances and disputes between Employers and employees, including the discharge of an employee, or any misunderstanding in the interpretation of this Agreement, to provide, insofar as possible, for the continuous employment of labor, and to bring about stable conditions in the industry, and to establish necessary procedure for the amicable adjustment of all disputes which may arise between Employers and employees.

## ARTICLE I
## CRAFT JURISDICTION

1.    This Agreement shall apply only to those employees as defined in Article VIII herein employed in line and grade work, including but not limited to: the work of establishing or re-establishing base lines, center and offset lines; establishing bench marks and the transferring of grades and elevations; the establishing of right-of-way, control points and lines; and the cross sectioning of areas. All instruments, including global positioning instruments and optical and electronic line, distance and grade devices used in connection with the above work. Field Engineer/Technical Engineer jurisdiction may terminate at the point where precise measurement by survey instruments has ended.

2.    The Local recognizes that surveying instruments; transits, levels, theodolites, electrotapes, lasers when used as instruments, piezometers when instrumented and fathometers, may be used by executive and supervisory personnel to check out work already done by employees covered under this Agreement.

3.    In the event of the absence of an employee, the Employer shall call for a replacement, and in the meantime, may do the work with supervisory personnel.

## ARTICLE II
## SCOPE OF EMPLOYMENT

1.    The parties to this Agreement believe that a uniform Agreement, when applied to line and grade work, if adopted by the Local and the Employers engaged in heavy and building construction, would further the interest of this industry. Building and heavy construction, where referred to in this Agreement, is defined as work performed within the scope of the project construction agreement including verification of location and elevation when necessary. This uniform Agreement should contain the following principles.

a. There should be no limitations to the amount of work a Field Engineer/Technical Engineer shall perform during the work day, it being understood that an employee shall perform a fair and honest day's work.

b. That there be no restrictions of the use of tools, appliances or new technologies.

c. Employees covered by this Agreement may be used by the Employer in other office related work.

d. This Agreement excludes executives, administrators, and supervisors, and shall not apply to any field survey work beyond the direct control of the Employer, or when the owner retains Licensed Land Surveyors or Licensed Professional Engineers to check or verify any work.

1

2.    When the Employer, party to this Agreement, does any work other th    the type of work covered by this Agreement, he shall conform to any applicable agreement that exists between an employing group and the International Union of Operating Engineers.

## ARTICLE III
## TERRITORIAL JURISDICTION

This Agreement shall apply within the territorial jurisdiction of Local No. 4 and its Branches as granted by the International Union of Operating Engineers and outlined herein as follows: Eastern part of Massachusetts, including Worcester County (with the exception of the townships of Sturbridge, Brookfield, Oakham, Hubbardston, Templeton, Royalston, and Winchendon); the State of Maine; and the eastern part of New Hampshire, including Counties Coos, Carroll, Strafford, Belknap, and Rockingham.

## ARTICLE IV
## LABOR MANAGEMENT RELATIONS

1.    The Local is recognized as the sole and exclusive agency and representative of the employees covered by this Agreement for the purpose of collective bargaining with respect to wages, hours of work, and other conditions of employment, and for the purpose also of other mutual aid and protection. The Employer shall not make any agreement in conflict with the provisions of this Agreement.

2.    Subject to applicable existing Federal and State Laws, the Employer recognizes that the Local is the established and prime source of skilled and dependable labor necessary or required to perform the kind of work covered within its craft jurisdiction; and that the Local is normally ready, able, and willing to supply such kind and quality of labor; and the Employer recognizes that all labor to be hired shall be of a kind and quality able to work efficiently with other labor employed or to be employed on work. The Employer agrees that on occasion of need for such labor, it shall notify the Local of the need for qualified workers in the classifications within its craft jurisdiction.

3.    Qualified workers procured by the Employer from other sources shall become and remain members of the Local after the seventh day from the date of employment. All employees shall be hired by the Employer.

4.    The Local may appoint stewards on jobs. The steward shall not be discriminated against because of his activities on behalf of the union. In the event a steward is laid off, he shall be given consideration on any new job opportunity for which he is qualified. Stewards shall be allowed to consult other engineers on the job with as little interruption as possible to the work. Business Agents shall be allowed to visit all jobs, inspect cards, appoint stewards, and enforce the provisions of this Agreement.

## ARTICLE V
## STRIKE AND LOCKOUTS

There shall be no suspension of work or establishment of picket lines during the time any dispute shall exist. The parties agree there shall be no lockouts by the Employer, nor any strikes or stoppage of work by the Local except for nonpayment of wages, including contributions to the Health & Welfare, Pension, Annuity & Savings Funds and the Apprentice Program Funds.

2

## ARTICLE VI
## SUBCONTRACTING

The Employer agrees not to sublet any work covered by this Agreement unless the subcontractor to whom the work is sublet is party to, or prepared to become party to, a current agreement with the Local. This clause shall not be applicable when the Employer hires a professional engineering firm for the purpose of certification.

## ARTICLE VII
## SIZE AND MAKE-UP OF PARTIES

The Employer shall determine the size and make-up of parties. The various classifications of the make-up of a party is to be determined according to the definition as set forth in Article VIII of this Agreement.

## ARTICLE VIII
## DEFINITION OF CLASSIFICATION

1.    RODPERSON - shall care for surveying equipment and tools; drive stakes, man tape and level rod; index, file and maintain line and grade data; make and flag grade stakes; prepare, apply and maintain control points, monuments, stations, turning points, and bench marks on construction sites; trace and letter maps and drawings from field sketches.

2.    INSTRUMENT PERSON - shall be capable of performing all of the duties of a Rodperson, shall set up and operate transit, level and related surveying instruments; make simple field drawings of lines and grades from sketches; direct Rodperson, establish lines and grades; handle all related computation problems.

3.    PARTY CHIEF - shall be capable of performing all the duties of Rodperson and Instrument Person, shall lay out work and the related lines and grades, direct the work of Rodperson and Instrument Person.

4.    CHIEF OF SURVEY - One who directs the activities of several survey crews, organizes the field work and may act as a working Party Chief.

## ARTICLE IX
## HOURS

1.    The regular work day shall consist of eight (8) hours a day between the hours of 8 a.m. and 4:30 p.m. These hours may be advanced one (1) hour or one-half (½) hour by the mutual agreement of the Employer and the Business Agent.

2.    Guaranteed forty (40) hours between Monday and Friday, except as provided below:

a. At the completion of work, which may come only after at least one full week worked immediately preceding completion, employees shall receive no less than three (3) days' pay unless the work extends beyond the third day, in which case a full week's wages shall be paid.

b. Employees, who voluntarily quit or are discharged shall receive pay for time actually worked.

3.    When two (2) shifts are employed, the starting time, unless changed by mutual agreement, shall be Monday 8 a.m., Monday 4 p.m., respectively, and second shift shall have completed a forty (40) hour week by midnight the following Friday. All work between Friday midnight and Saturday midnight to be paid for at the rate of time and one-half. All work between Saturday midnight and Sunday midnight shall be paid at the rate of double time.

3

4.      When three (3) shifts are employed, the starting time shall be Monday 8 a.m., Monday 4 p.m., Monday 12 midnight, respectively, and last shift shall have completed a forty (40) hour week by 8 a.m. the following Saturday. All work between 8 a.m. Saturday and 8 a.m. Sunday shall be paid for at the rate of time and one-half. All work between 8 a.m. Sunday and 8 a.m. Monday shall be at the rate of double time.

5.      Employees, when ordered out on a Saturday or Sunday shift, shall receive a guarantee of eight (8) hours work at premium pay, unless the inclement weather clause conditions as follow apply:

Inclement Weather: In the event that members of the Local are ordered out for work on Saturdays and/or Sundays, and due to inclement weather only are unable to work, they shall be paid as follows:

  a. For reporting but not starting, they shall receive two (2) hours at the premium rate.

  b. For starting work, they shall receive no less than four (4) hours at the premium rate.

  c. For work continuing beyond the fourth hour, they shall receive a minimum of eight (8) hours at the premium rate.

6.      The holidays which are to be observed in this Agreement are as follows: New Year's Day, Washington's Birthday, Patriots Day, Memorial Day, July Fourth, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day, Christmas Day, or days on which these holidays are observed. An employee shall receive eight (8) hours straight time pay for a holiday not worked including a holiday falling on Saturday.

  a. Employees ordered out on the above holidays shall receive a guarantee of eight (8) hours work at two times their regular rate of wages, within the hours of their regular shift.

  b. No employee shall be eligible for holiday pay when he fails, without cause, to work the regular work day preceding the holiday or the regular work day following the holiday.

## ARTICLE X
## OVERTIME

        The overtime premium rate for Field Engineers covered by this Agreement shall be the same as contained in the applicable Local 4 Operating Engineers Agreements for Building, Heavy/Highway, or Marine construction and shall depend upon the type of construction work upon which Field Engineers/Technical Engineers are working.

## ARTICLE XI
## EQUIPMENT AND RAIN GEAR

1.      Rain gear shall be supplied by the Employer.

2.      All survey and layout equipment and/or supplies such as tapes, chains, plumb bobs, chalk boxes, pencils, rules, field books, and any other supplies needed for the job are to be provided by the Employer.

3.      Employees shall be responsible for rain gear, equipment, and supplies issued to them.

*ARTICLE XII*
## HEALTH & WELFARE, PENSION, ANNUITY & SAVINGS
## AND APPRENTICE PROGRAM FUNDS

1.      Each Employer who is a party to this Agreement agrees to and shall pay and contribute an amount equal to that shown under the "Schedule of Wages" in this Agreement to the following:

  a. International Union of Operating Engineers Local 4 Health & Welfare Fund, hereinafter referred to as the "**Welfare Fund.**"

  b. International Union of Operating Engineers Local 4 Pension Fund, hereinafter referred to as the "**Pension Fund.**"

  c. International Union of Operating Engineers Local 4 Annuity Fund, hereinafter referred to as the "**Annuity & Savings Fund.**"

  d. International Union of Operating Engineers Local 4 Apprenticeship and Training Program, hereinafter referred to as the "**Apprentice Program Fund.**"

  e. Each Employer who is party to this Agreement subscribes to and agrees to be bound by the respective Trust Agreements, as amended, for the above named Funds.

2.      The respective rates per hour as shown in the "Schedule of Wages" in this Agreement shall be paid for each payroll hour (with the exception of Annuity contributions, an overtime hour for this purpose shall be considered a single hour) and proportionately for each part of such an hour for each person covered by this Agreement and employed on construction projects on which the Employer shall be engaged or otherwise in the hire of the Employer. Overtime contributions to the Annuity & Savings Fund shall be paid at time and one-half for all classifications of overtime.

  a. Upon proper written authorization on a form furnished by the Local, the Employer shall withhold from the employee's gross wage, before any deduction for taxes, an amount as established from time to time by the Annuity Trustees, for deposit in the **Annuity & Savings 401(k) Plan**, a Retirement Plan intended to qualify under the Employee Retirement Income Security Act of 1974 (ERISA).

3.      On or before the 10th day of each month the said payment shall be due and payable for all such payroll periods ending the next preceding month but in the case of operations of less than a month's duration, or in the case of Employers who are repeatedly delinquent in payments, the payment shall be due weekly and payable within three (3) days after the end of the payroll week.

4.      The Employer agrees that the obligations to make payments shall be on a parity and enforceable, with respect to each fund, as the obligation to pay wages, and this inclusive of the priorities incident to and in proceedings for the relief of debtors; and this Article shall bind all legal representatives, successors, and assigns of the Employer.

5.      The Trustees, or their representative when authorized by the Trustees in each case, shall have the right to inspect, at all reasonable times, the individual payroll records and such other records of an Employer as are deemed necessary and pertinent to determine whether such Employer is making due and full payment of its Employer Contributions.

6.    Failure of the Employer to comply with this Article or any part thereof may be treated by the Local as a breach of the working agreement between the Local and the defaulting Employer; and notwithstanding other provisions of this Agreement (Arbitration, Article XVI), or otherwise to the contrary, immediate work stoppage and use of picket lines against such defaulting Employer are permitted. Any cost, inclusive of legal fees, incurred by the Local in the collection of obligations to make payments due the Welfare and Pension Funds, the Annuity & Savings Fund and the Apprentice Fund shall be borne by the defaulting Employer.

7.    Notwithstanding any termination or cancellation under this Agreement or otherwise, the obligations of this Article and of the several Declarations of Trust shall be deemed continuous and the Pension Fund, Health & Welfare Fund, Annuity & Savings Funds and Apprentice Program Funds shall not be discontinued pending negotiations of a new Agreement.

8.    The Welfare, Pension, Annuity & Savings and Apprentice Program Funds shall be respectively administered by three (3) Trustees appointed and/or elected by the Local and one (1) by the Foundation and Marine Contractors Association of New England, Inc., one (1) by the Building Trades Employers' Association of Boston and Eastern Massachusetts, Inc. and one (1) by the Construction Industries of Massachusetts Inc., Labor Relations Division, (unless it shall be mutually agreed to decrease the number of Trustees or to consolidate the Welfare Fund and pension Fund with the Funds respective of other similar Funds) under one or more Agreements and Declarations of Trust as they are or shall be executed by such Trustees.

9.    The Welfare Fund shall be used for the purpose of providing health and welfare benefits for employees covered by this Agreement and their dependents by means of insurance or otherwise in the discretion of the Trustees.

10.    The Pension Fund shall be used for the purpose of providing pension benefits for employees covered by this Agreement by means of insurance or otherwise in the discretion of the Trustees.

11.    The Annuity & Savings Fund shall be used for the purpose of providing pension benefits for employees covered by this Agreement by means of annuity contracts or otherwise in the discretion of the Trustees, and to assist the members in attaining their savings objectives.

12. The Apprentice Program Fund shall be used for the purpose of providing and defraying costs of apprenticeship or other training programs.

## ARTICLE XIII
### DUES DEDUCTION

1.    It is agreed that the Employer shall deduct one and one-quarter (1¼%) percent of gross wage and benefit package before any deduction for taxes, for each payroll hour as defined in Article XII, Section 2, provided the employee has executed a written authorization for such deduction. All such deductions shall be reported monthly on a single form along with all the other Funds provided for in the Agreement. One check covering the total of all the Funds shall be sent along with the form in accordance with the provisions of Article XII.

2.    It shall be the sole responsibility of the Local Union to procure, pursuant to the provisions of Section 302 (c) of the Labor Management Relations Act of 1947, the signed individual authorization of every employee subject to this Agreement, both present and future. The Local shall indemnify and hold harmless the Employer from any claims arising under this Article including the furnishing of counsel to defend against any such actions.

6

## ARTICLE XIV
## SOCIAL and POLITICAL ACTION COMMITTEES

1. The Social and Political Action Committees (SAC/PAC) Funds, administered by the Local shall be funded by a voluntary five (5) cents per hour payroll deduction, the purpose of which shall be to enable the Local to participate more fully in matters affecting the welfare of its members.

2. It is agreed that the Employer shall deduct five (5) cents from net wages after taxes, for each payroll hour as defined in Article XII, Section 2, provided the employee has executed a written authorization for such deduction. All such deductions shall be reported monthly on a single form along with all the other Funds provided for in the Agreement. A check covering the total of all the Funds shall be sent along with the form in accordance with the provisions of Article XII, Sections 2 and 3.

3. It shall be the sole responsibility of the Local to procure pursuant to the provisions of Section 302 (c) of the Labor Management Relations Act of 1947, the signed individual authorization of every employee subject to this Agreement, both present and future. The Local shall indemnify and hold harmless the Employer from any claims arising under this Article including the furnishing of counsel to defend against any such actions.

## ARTICLE XV
## FOUNDATION FOR FAIR CONTRACTING

Each Massachusetts Employer who is party to this Agreement agrees to and shall pay and contribute two (2) cents per hour to the Foundation For Fair Contracting of Massachusetts. All such payments and contributions shall be reported monthly on one form along with all other Funds provided for in the agreement.

## ARTICLE XVI
## ARBITRATION

1. In the case of a claim for a violation or disagreement as to the intent or terms of this Agreement, there shall be no stoppage of work. Any and all disputes shall be referred to a board of Arbitrators consisting of two men to be selected by each party to this Agreement.

2. The Board shall make its decision within seventy-two (72) hours. In the event of the failure of the Board to arrive at a solution, an Umpire shall be chosen by them, to whom the matter in dispute shall be referred, whose decision shall be final. The costs of such arbitration shall be borne equally by both parties.

## ARTICLE XVII
## WAGES

1. To maintain the historical relationship between Local 4 Operating Engineers and Field Engineers, the wage increases for each year of this Agreement will be the same as settled with Local 4 Operating Engineers, for the year, that is: Chief of Party will receive the same increase as the Group I rate; Instrument Person will receive the same increase as Group II and Rodperson will receive the same increase as Group IV B. All will get the fringe benefit increase which is uniform for all groups.

2. See attached "SCHEDULE OF WAGES."

## *ARTICLE XVIII*
### BONDING

1.     The Employer may, at the discretion of the Business Manager, be required to provide a surety bond to guarantee payment to the Health & Welfare, Pension, Annuity and Apprentice Program Funds as well as payment of Dues and Social Action Committee payroll deductions under any one of the following circumstances:

a.     An Employer with no prior contribution history to the I U O E Local 4 Fringe Benefit Funds.

b.     An Employer who becomes (sixty) 60 days or more delinquent in submitting payment of contributions due.

2.     An Employer who is required to furnish a bond under this Article will be released from its obligation after a twelve (12) consecutive month period during which it was not delinquent in its contributions.

3.     Copies of the bond and/or renewal certificate from the bonding company indicating the bond has been purchased and paid for by the Employer must be furnished to the Local or Fringe Benefit Office.

4.     The amount of bond shall be six (6) times the estimated monthly total contributions, but not less than $25,000.

5.     Whenever an Employer is over one (1) month in default of payment to the Health & Welfare, Pension, Annuity & Savings or Apprentice Program Funds, or payment of Dues and SAC payroll deductions, and reasonable notice of such default is given to the Employer, the Local may remove its members from the work of said Employer, all other provisions of this agreement notwithstanding.

a.     If such members as are removed remain on the work site during the regular working hours, they shall be paid for the lost time, not to exceed three (3) days' pay.

6.     The Trustees may at their discretion, require any Employer who becomes sixty (60) days or more delinquent in its contributions to make weekly reports and payments of contributions.

## *ARTICLE XIX*
### DRUG ABUSE PREVENTION AND DETECTION

The parties recognize the problems which drug abuse have created in the construction industry and the need to develop drug abuse prevention programs. Accordingly, the parties agree that in order to enhance the safety of the work place and to maintain a drug free work environment, individual Employers may require applicants or employees to undergo drug screening. The parties agree that if a screening program is implemented by an individual Employer, the following items have been agreed upon by Labor and Management:

1.     It is understood that the use, possession, transfer, or sale of illegal drugs, narcotics, or other unlawful substances is absolutely prohibited while employees are on the Employer's job premises or while working on any site in connection with work performed under the applicable agreement.

2.     All applicants or newly hired employees will undergo a drug screen at a facility agreed upon by the Employer and the Union. The Employer agrees to pay each applicant or employee who takes and passes the drug screen test for all the time it takes to undergo the drug screen up to a maximum of two hours travel time plus lab time. This paragraph shall not apply to applicants who have worked for the Employer within the prior 18 months of the date of application for re-employment.

8

3.    Applicants not passing the drug screen will not be placed on the Employer's payroll or receive any compensation. Employees not passing the drug screen will be removed from the Employer's payroll. The Employer agrees to pay the cost for administering the drug screen.

4.    The Employer may require that an employee be tested for drugs where the Employer has reasonable cause to believe that the employee is impaired from performing his/her job. Observation must be made by at least two (2) persons, one of whom may be a Union employee. This provision shall be applied in a non-discriminatory manner. Supervisors will administer the program in a fair and confidential manner. For employees who refuse to take a test where the prerequisites set forth in this paragraph have been met, there will be a rebuttable presumption that the test results would have been positive for an unlawful substance.

5.    An Employer may require that an employee who contributed to an accident be tested for drugs where the Employer has reasonable cause to believe that the accident resulted from drug usage.

6.    There will be no random drug testing by the signatory Employer.

7.    It is understood that the unsafe use of prescribed medication, or where the use of prescribed medication impairs the employee's ability to perform work, is a basis for removal.

8.    A sufficient amount of a sample shall be taken to allow for an initial test and a confirmation test. The initial test will be by Enzyme Multiplied Immunoassay Technique (EMIT). In the event a question or positive results arises from the initial test, a confirmation test must be utilized before final action can be taken against the employee or applicant. The parties recognize that in most cases the Employer will not be aware of any positive results arising from an initial test until after the results of the confirmation test are made known; however should the employee be suspended based on any initial test results and the confirmation test indicates that the initial test was erroneous and the confirmation test is negative, the employee shall be reinstated with all lost earnings. The confirmation test will be by Gas Chromatography Mass Spectrometry (GC/MS). Testing standards for both the initial test and confirmation test will be those established by the National Institute of Drug Abuse. Confirmed positive samples will be retained by the testing laboratory in secure long-term frozen storage for a minimum of one year. Handling and transportation of each sample must be documented through strict chain of custody procedures.

9.    Present employees, if tested positive, shall have the option of a rehabilitation program at the employee's expense. When such program has been successfully completed, the Employer shall not discriminate in any way against the employee. If work for which the employee is qualified exists, he or she shall be reinstated.

10.    Any dispute which arises under this drug policy shall be submitted to the grievance and arbitration procedure set forth in the applicable Agreement.

11.    In the event an individual Employer is required, as a condition of contract award, to abide by the terms and conditions of an owner's drug policy, the Employer will notify the interested Unions in writing prior to implementing such policy.

12.    The establishment or operation of this policy shall not curtail any right of an employee found in any law, rule, or regulation. Should any part of this policy be found unlawful by a court of competent jurisdiction or a public agency having jurisdiction over the parties, the remaining portions of the policy shall be unaffected and the parties shall enter negotiations to replace the affected provision.

13.    The Employer shall indemnify and hold the Local harmless against any and all claims, demands, suits or liabilities that may arise solely out of the Employer's application of the Substance Abuse Program.

### ARTICLE XX
### TERMINATION

The terms and conditions of this Agreement shall be effective the first (1st) day of November 1999, and shall continue in effect through the thirty first (31st) day of October 2003.

This Agreement shall continue to be effective from year to year unless either party, at least sixty (60) days prior to October 31, 2003, or prior to October 31st in any year thereafter gives notice in writing to the other party of its intention to terminate said Agreement and requests that negotiations be entered into for its alteration or amendment, and in the event that the parties hereto cannot reach an agreement at least 30 days prior to October 31, 2003, or thirty days prior to October 31st in any year thereafter, such party shall give notice of the failure to reach such agreement to the Federal Mediation Service and any appropriate State Agency.

FOR THE EMPLOYER

FOR THE INTERNATIONAL UNION OF
OPERATING ENGINEERS LOCAL 4E

SAI Surveying Corp.
**COMPANY**

**BUSINESS MANAGER**

President
**BY**                                **TITLE**

**PRESIDENT**

**RECORDING SECRETARY**

23 Narragansett Ave
**ADDRESS**

Jamestown RI        02835
**CITY**        **STATE**        **ZIP**

401 / 423-0650 / 0037
**PHONE**        **FAX**

# INTERNATIONAL UNION of OPERATING ENGINEERS - LOCAL 4

### November 1, 1999 - October 31, 2003

# SCHEDULE OF WAGES

## FIELD ENGINEERS/TECHNICAL ENGINEERS

## MASSACHUSETTS

| CLASSIFICATION | 11/1/1999* | 5/1/2000* | 11/1/2000* | 5/1/2001* | 11/1/2001* | 5/1/2002* | 11/1/2002* | 5/1/2003* |
|---|---|---|---|---|---|---|---|---|
| Party Chief | 26.67 | 26.91 | 27.69 | 28.38 | 29.26 | 30.14 | 31.12 | 32.10 |
| | 1066.80 | 1076.40 | 1107.60 | 1135.20 | 1170.40 | 1205.60 | 1244.80 | 1284.00 |
| Instrument Person | 25.77 | 25.98 | 26.73 | 27.39 | 28.23 | 29.08 | 30.02 | 30.96 |
| | 1030.80 | 1039.20 | 1069.20 | 1095.60 | 1129.20 | 1163.20 | 1200.80 | 1238.40 |
| Rod Person | 17.74 | 17.73 | 18.24 | 18.66 | 19.24 | 19.81 | 20.46 | 21.10 |
| | 709.60 | 709.20 | 729.60 | 746.40 | 769.60 | 792.40 | 818.40 | 844.00 |

**Chief of Survey** — The Chief of Survey shall be paid one dollar ($1.00) per hour above the Party Chief rate.

## NEW HAMPSHIRE/MAINE

**CLASSIFICATION**

**Party Chief** — CURRENT GROUP I BUILDING RATE IN NEW HAMPSHIRE/MAINE

**Instrument Person** — CURRENT GROUP I BUILDING RATE IN NEW HAMPSHIRE/MAINE LESS 75¢ PER HOUR

**Rod Person** — CURRENT GROUP IVB BUILDING RATE IN NEW HAMPSHIRE/MAINE

**Chief of Survey** — The Chief of Survey shall be paid eighty cents ($.80) per hour above Party Chief rate.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Health & Welfare | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 |
| Pension | 3.82 | 3.82 | 3.82 | 3.82 | 3.82 | 3.82 | 3.82 | 3.82 |
| Apprenticeship | .10 | .10 | .10 | .10 | .10 | .10 | .10 | .10 |
| Annuity | 2.50 | 3.00 | 3.00 | 3.00 | 3.00 | 3.00 | 3.00 | 3.00 |
| Foundation for Fair Contracting | .02 | .02 | .02 | .02 | .02 | .02 | .02 | .02 |

**OTHER** — Dues Assessment 1¼% deducted from total Wage and Benefit Package; Social and Political Action Committee, 5¢ per hour.

The Local may, at its option, utilize part of these increments for increases to Health & Welfare, Pension, Annuity, Social and Political Action Committees, Dues Deduction and Foundation for Fair Contracting.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CLERK'S NOTICE

This document can not be scanned due to its size, or the way in which it was bound.

The original is available for viewing in the Clerk's Office.